UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 20-cr-259 (JRT/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| EDWARD DUANE FAIRBANKS, | |
| Defendant. | |

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Edward Duane Fairbank's ("Defendant") Motion to Suppress Statement, [Docket No. 37], and Motion to Suppress Search and Seizure, [Docket No. 38]. The Court held a Motions Hearing on May 21, 2021, regarding Defendant's pretrial motions at which the parties requested the opportunity to submit supplemental briefing on the present Motions. The supplemental briefing was completed on July 20, 2021, after which Defendant's Motion to Suppress Statement, [Docket No. 37], and Motion to Suppress Search and Seizure, [Docket No. 38], were taken under advisement.[1]

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statement, [Docket No. 37], be **DENIED**, and Defendant's Motion to Suppress Search and Seizure, [Docket No. 38], be **DENIED**.

---

[1] The Court addressed Defendant's pretrial discovery motions by separate Order. [Docket No. 44].

I.  **Background and Statement of Facts**

   A.  **Background**

Defendant is charged with one count of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 113(a)(6), 1151, 1153(a), and 3559(f)(3). (Indictment [Docket No. 1]).

   B.  **Facts**

On June 9, 2020, Minnesota Bureau of Criminal Apprehension Special Agent Ricky Wuori, Jr. ("SA Wuori") received a request to assist in an investigation into an injury to a child that had occurred at a residence on the White Earth Indian Reservation the previous day. (Tr. [Docket No. 47], at 18–19, 41–43). The child had been hospitalized and underwent emergency surgery due to a significant head injury. (Id. at 41). Defendant was the only adult present at the time of the child's injury, and he was the leading suspect in the investigation. (Id. at 42–43). During his investigation, SA Wuori received information that Defendant was going to meet with his grandmother in Mahnomen, Minnesota. (Id. at 20). SA Wuori decided to find Defendant so that he could then attempt to speak with him about the circumstances surrounding the child's injury. (Id.).

At approximately 8:34 p.m., SA Wuori located and made contact with Defendant at the Star Mart gas station in the parking lot of the Shooting Star Casino. (Id. at 20–21, 43). SA Wuori arrived at the Star Mart with Mahnomen County Sheriff's Office Investigator Richard Winkler ("Investigator Winkler") in SA Wuori's unmarked police vehicle. (Id. at 21). Sergeant Jamie Allen of the White Earth Tribal Police Department was also present at the Star Mart in a marked police car. (Id. at 21, 25).

After parking his vehicle, SA Wuori and Investigator Winkler approached another vehicle in which Defendant was a backseat passenger. (Id. at 21–25, 43). Defendant's uncle and grandmother were also in the vehicle with him. (Id. at 27–28). SA Wuori was wearing blue jeans

and a t-shirt, and Investigator Winkler was wearing a polo shirt and duty pants. (Id. at 23, 34). SA Wuori and Investigator Winkler's entire interaction with Defendant at the Star Mart was recorded.[2] (Id. at 22–23).

SA Wuori first made contact with Defendant's grandmother who was in the front passenger seat. (Id. at 22). SA Wuori stated that he needed to speak with Defendant, he asked if Defendant was in the vehicle, and he learned that Defendant was in the backseat. (Gov't's Ex. 2, at 1; Tr. [Docket No. 47], at 25, 43–44). After introducing himself, SA Wuori and Investigator Winkler asked Defendant if he would mind coming to the Sheriff's office and talking to them. (Gov't's Ex. 2, at 2; Tr. [Docket No. 47], at 25–26, 44). Defendant agreed to talk with them, and he subsequently travelled to the Mahnomen County Sheriff's Office with his uncle and grandmother in their vehicle. (Gov't's Ex. 2; Tr. [Docket No. 47], at 26–28, 45; see also, Gov't's Ex. 4, at 1). SA Wuori and Investigator Winkler drove in tandem to the Mahnomen County Sheriff's Office in SA Wuori's vehicle. (Tr. [Docket No. 47], at 27–28, 45–46). Prior to leaving the Star Mart, SA Wuori stated that Defendant was "not under arrest or anything." (Gov't's Ex. 2, at 3).[3]

At approximately 8:44 p.m. on June 9, 2020, SA Wuori arrived at the Mahnomen County Sheriff's Office. (Id. at 46; see also Gov't's Ex. 4, at 1). Upon arrival, SA Wuori parked in the back lot, activated his recording device, and exited his vehicle. (Id. at 28–29). SA Wuori and Investigator Winkler's entire interaction with Defendant at the Mahnomen County Sheriff's Office was recorded.[4] (Id. at 28, 36).

---

[2] At the Motions Hearing, the Government, without objection, offered an audio recording, as well as, a transcript of his interaction with Defendant at the Star Mart on June 9, 2020, into evidence as Government Exhibits 1 and 2, respectively. (Id. at 14–15).

[3] Defendant was not placed in handcuffs at any point during his interaction with law enforcement the Star Mart. (Tr. [Docket No. 47], at 26). At the Motions Hearing, SA Wuori testified that Defendant was cooperative and appeared to understand what was being asked of him.

[4] At the Motions Hearing, the Government, without objection, offered an audio recording, as well as, a transcript of his interaction with Defendant at the Mahnomen County Sheriff's Office on June 9, 2020, into evidence as Government Exhibits 3 and 4, respectively. (Id. at 14–15).

SA Wuori and Investigator Winkler met Defendant on the sidewalk in front of the parking lot. (Id. at 29). Investigator Winkler then used a key fob to open the door to the Sheriff's Office, and the law enforcement officers brought Defendant to a "squad room" or "office room" to interview Defendant. (Id. at 30, 46). Defendant's uncle and grandmother did not enter the Sheriff's office. (Id. at 46). The squad room had desks in it with one or two computers, and it was approximately twelve by fourteen feet in size. (Id. at 31). SA Wuori testified at the Motions Hearing that it was big enough to have ample space for three people. (Id. at 31–32). The door to the squad room was shut for privacy during the interview, but it was not locked. (Id. at 32). During the interview, Defendant sat closest to the door and SA Wuori sat opposite with Investigator Winkler to his right. (Id. at 32–33). SA Wuori and Investigator Winkler were both armed during the interview, but neither took their firearms out of their holsters. (Id. at 34–35, 54). Defendant was not handcuffed or otherwise restrained in any way during the interview. (Id. at 31).

SA Wuori and SA Winkler then proceeded to interview Defendant. SA Wuori testified at the Motions Hearing that the purpose of the interview was to get a confession from Defendant. (Id. at 48–49). At the time of the June 9, 2020, interview, SA Wuori believed he already had probable cause to arrest Defendant if he so chose. (Id. at 49).

At the outset of the June 9, 2020, interview, SA Wuori informed Defendant:

> So just so you know, you're not under arrest, um you're free to leave. You can leave at any point in time. You're here on your own free will. You can decide at any time to not talk to us. That door is open. You can walk out and terminate this interview at any time.

(Gov't's Ex. 4, at 1). Immediately thereafter, SA Wuori asked Defendant, "You understand that?," and Defendant responded in the affirmative. (Id.). SA Wuori next asked Defendant, "Um with that in mind, is it okay if we, we talk to you?," and Defendant again responded in the affirmative. (Id.).

4

Defendant subsequently provided the interviewers with some basic contact information, and SA Wuori again asked, "Um do you understand that also um uh you know you can leave at any time, you can stop the statement at any time?" (Id. at 2). Defendant affirmatively responded, "okay." (Id.). SA Wuori continued, "You know like I said you don't have to talk to us," and Defendant again affirmatively responded, "okay." (Id.).

The interviewers then proceeded to question Defendant about the circumstances surrounding the child's injuries on June 8, 2020. (Id. at 2–19). During the interview, Defendant attributed the child's injuries to a mattress falling on the child. (See, e.g., Id. at 6). Defendant also denied ever striking, hitting, or pushing the child. (See, e.g., Id. at 18–19).

At one point in during the interview, SA Wuori challenged Defendant's story of what happened. (Id. at 19). SA Wuori testified at the Motions Hearing that he thought Defendant was lying. (Tr. [Docket No. 47], at 50). SA Wuori told Defendant that he had been to the residence and seen the mattress, and Defendant's story "isn't adding up." (Gov't's Ex. 4, at 19). SA Wuori further told Defendant that what Defendant was saying did not make sense because the mattress was not heavy enough to cause the sort of impact and force required to inflict the child's injuries, and that it did not make sense with what the doctor had told law enforcement. (Id.). Defendant insisted that he was telling the interviewers what had happened. (Id.).

Near the end of the interview, Officer Wuori asked Defendant if he could take Defendant's cellular phone and download information off it. (Id. at 22). Defendant was reluctant to leave his phone, but he provided verbal consent after SA Wuori said that he could return the phone to Defendant's grandma's residence the following day. (Id.). Defendant also provide SA Wuori with the passcode to access the phone. (Id. at 22).

5

The interviewers also asked Defendant if he was wearing the same clothes as when the child's injury occurred, and they noted that it looked like Defendant' pants had a stain on them. (Id. at 22–23). Defendant then affirmatively volunteered to give the clothing to the interviewers by replying, "Oh . . . mark fuckin', more like fuck'n, I' don't know what, you can take them if you want." (Id. at 23). Defendant later gave his clothes to the interviewers, but he declined to give them his shoes. (Id. at 26; Tr. [Docket No. 47], at 39).

SA Wuori also asked if Defendant had access to a phone, and Defendant stated he did. (Gov't's Ex. 4, at 24). Next, SA Wuori provided Defendant with his number, and he informed Defendant that if at any time he wished to revoke his consent he could do so by calling SA Wuori. (Id.). SA Wuori subsequently filled out a Mahnomen County Sheriff's Office Consent to Search form.[5] (Tr. [Docket No. 47], at 37–38; see also, Gov't's Ex. 5) Before Defendant signed the Consent to Search form, SA Wuori further informed Defendant:

> If you want to review this um this is the consent. Like I said I can't force you to go give me consent, it's your choice, your choice alone. You do have the right to um not provide me consent or deny me consent. . . . So if you want to review and go ahead and if you understand everything in that form, sign.

(Gov't's Ex. 4, at 24). SA Wuori also confirmed that Defendant had his phone number, and Defendant affirmatively indicated that he did. (Id. at 24–25). At 9:33 p.m., Defendant signed the Consent to Search form. (Tr. [Docket No. 47], at 39; Gov't's Ex. 5).

---

[5] At the Motions Hearing, the Government, without objection, offered the Consent to Search form into evidence as Government's Exhibit 5. (Tr. [Docket No. 47], at 14–15). The Consent to Search form indicates that Defendant voluntarily gave consent to search his Samsung cell phone. (Gov't's Ex. 5). The Consent to Search form also states:

> I understand that I have a constitutional right to refuse consent to the search(es) described above and I am not required to sign this form. . . . Furthermore, I understand that any items seized or information obtained . . . may be used against me at any future hearing or trial. I also understand that I can limit the scope of any consent to search I do grant and that I can revoke my consent to search at any time, but I must notify the enforcement officer(s) if I intend to do so.

(Id.). The Consent to Search form does not reference Defendant's clothes. (See, Id.). SA Wuori testified that it was an error on his part not to include Defendant's clothing on the Consent to Search form. (Tr. [Docket No. 47], at 39–40).

6

At approximately 9:39 p.m. on June 9, 2020, SA Wuori ended the interview and stopped the recording. (Gov't's Ex. 4, at 27; Tr. [Docket No. 47], at 54). Throughout the interview's recording, the interviewers can be heard maintaining a conversational tone without raising their voices to yell or threaten Defendant. Likewise, Defendant maintained a conversational tone, and he was clearly cooperative and self-assured throughout the interview. Defendant also responded appropriately to any questions presented.[6]

When the interview concluded, Investigator Winkler walked Defendant out to the Mahnomen County Sheriff's Office, and he used his fob to open the exterior door. (Tr. [Docket No. 47], at 40, 47). Defendant was not arrested on June 9, 2020. (Id. at 55).

## II.  Defendant's Motion to Suppress Statement. [Docket No. 37].

Defendant now moves the Court for an Order suppressing the statements made by him during the June 9, 2020, interview conducted by law enforcement at the Mahnomen County Sheriff's Office. (Def.'s Mot. to Suppress Statement [Docket No. 37]).

Defendant does not contend that he was in custody during the interview.[7] To the contrary, Defendant concedes that "there isn't a question of custodial interrogation," and Defendant asserts

---

[6] In addition, SA Wuori testified at the Motions Hearing that during the June 9, 2020, interview, Defendant was cooperative, appeared to understand what was being discussed and asked of him, and he did not appear to be tired or under the influence of drugs or alcohol. (Tr. [Docket No. 47], at 36, 55, 57–58).

[7] Even if Defendant had, the Court finds that Defendant was clearly not in custody during the June 9, 2020, interview. "To determine whether a suspect was in custody, we ask 'whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave.'" United States v. Laurita, 821 F.3d 1020, 1024 (8th Cir. 2016) (quoting United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011)). The Eighth Circuit has set forth non-exclusive factors to consider in determining whether a suspect is in custody. Id. Here, the totality of the circumstances, including those factors, clearly indicate that Defendant was not in custody at the time of the June 9, 2020, interview. Defendant voluntarily agreed to speak with law enforcement at the Star Mart, and he voluntarily drove to the Mahnomen County Sheriff's Office for that purpose. (Gov't's Ex. 2; Tr. [Docket No. 47], at 26–28, 45; see also, Gov't's Ex. 4, at 1). Prior to leaving the Star Mart, SA Wuori stated that Defendant was "not under arrest or anything." (Gov't's Ex. 2, at 3). At the Mahnomen County Sheriff's Office, Defendant was interviewed in a squad room with ample space for three people, only two law enforcement officers were present during the interview, they were both casually dressed, neither drew their weapons, law enforcement did not engage in strong arm or deceptive tactics, Defendant sat nearest to the unlocked door to the room, Defendant was not handcuffed or otherwise restrained during the interview, and at the conclusion of the interview Defendant was not arrested. (See, e.g., Gov't's Ex. 3; Tr. [Docket No. 47], at 30–35, 40, 46–47, 55). Most importantly, at the outset of the June 9, 2020, interview, Defendant was expressly informed that he was not under arrest, his participation in the interview was

7

that "the issue is one of voluntariness." (Id. at 2; see also, Mem. in Supp. [Docket No. 49], at 3–4). Defendant argues that "[w]hile he may not have been in legally defined custody, this posit does not lead to the conclusion that [Defendant's] statement was necessarily voluntary." (Mem. in Supp. [Docket No. 49], at 4). As such, the only issue now before the Court is whether Defendant's statements made during the June 9, 2020, interview were made voluntarily.

In determining whether a statement was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002); see also, United States v. Annis, 446 F.3d 852, 855 (8th Cir. 2006) ("A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne."). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted); see also, Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Here, Defendant asserts that "[t]he central deceit promoted by law enforcement is that somehow, someway, if the suspect speaks with them he will be helped," and "[t]o avoid such

---

voluntary, he could decide to stop the interview at any point, and he was free to walk out and leave at any time. (Gov't's Ex. 4, at 1–2). Defendant indicated that he understood his participation was voluntary and he could leave at any time. (Id.).

8

manipulation," the interviewers should have "sought his consent to speak by having him sign his name to a document that explained why he was at the station, hence assuring proof of his voluntariness in writing." (See, Mem. in Supp. [Docket No. 49], at 6–7). Defendant also points to several other circumstances that he contends indicate his statements were involuntary. Specifically, Defendant argues that his consent was not voluntary because he was not informed that he was a suspect or that law enforcement sought a confession from him despite law enforcement already having probable cause to arrest him, the Mahnomen County Sheriff's Office required a key fob to open the exterior door, law enforcement did not offer for Defendant to have another individual accompany him into the interview, and he was not given a Miranda warning. (See, Mem. in Supp. [Docket No. 49]).

However, after informing him the interview was voluntary and could be terminated at any time, the interviewers expressly asked Defendant if it was okay if they spoke with him, and Defendant affirmatively indicated that it was. (Gov't's Ex. 4, at 1). The interviewers were simply not obligated to also have Defendant indicate in writing that he would voluntarily speak with them. Indeed, law enforcement is under no such obligation even after a suspect has been taken into custody. See, e.g., United States v. Woods, 829 F.3d 675, 680 (8th Cir. 2016) (citation omitted) ("A defendant can validly waive his rights orally or in writing. A defendant's refusal to sign a written waiver form does not make his subsequent statements inadmissible."). Nor were the interviewers required to advise Defendant of his Miranda rights, as he was not in custody during the interview. See, United States v. Gibony, 863 F.3d 1022, 1029 (8th Cir. 2017) (holding that statements made during a non-custodial encounter need not be suppressed for the lack of Miranda warnings).

Defendant's contention that the interviewers deceived him into thinking he would be helped by speaking to them also does not render his statements involuntary. See, Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) ("The statement to an accused that telling the truth 'would be better for him' does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary."); United States v. Mariano, No. 11-cr-243 (DWF/SER), 2011 WL 7031113, at *8 (D. Minn. Nov. 22, 2011), report and recommendation adopted by 2012 WL 116036 (D. Minn. Jan. 13, 2012) ("The fact that [the defendant] was told that his cooperation could be beneficial to him was not a promise and did not overbear his free will.").

Similarly, even if the fact that the interviewers did not inform Defendant that he was a suspect or that they sought a confession could be construed as deceptive, "[t]actics such as deception . . . do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." See, Simmons, 235 F.3d at 1133; see also, United States v. Stately, No. 19-cr-342 (ECT/LIB), 2021 WL 1321269, at *11–12 (D. Minn. Jan. 11, 2021), report and recommendation adopted by 2021 WL 1187152 (D. Minn. Mar. 30, 2021) (rejecting the defendant's argument that his statements were involuntary because he was "tricked into agreeing to an interview under the guise that he was being interviewed as a crime victim, not a suspect"); cf., Syslo, 303 F.3d at 866 (quotations omitted) (noting that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant," as well as, that "the Supreme Court has never held that mere silence as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights").

The mere fact that Defendant was alone with two officers in the Mahnomen County Sheriff's Office also does not render his statements involuntary, nor does the fact that a key fob

was required to enter the building. See, United States v. Galceran, 301 F.3d 927, 929–31 (8th Cir. 2002) (finding that statements were voluntary where an interview occurred in a "roll call room" at the police station with two officers and the defendant present, and noting that "the interview's setting was not police dominated, even though the interview took place at a police station").

In short, none of the circumstances observed by Defendant render his statements during the June 9, 2020, interview involuntary unless the overall impact of the interrogation caused his will to be overborne. See, United States v. Braveheart, 397 F.3d 1035, 1041 (8th Cir. 2005) (citation and quotation omitted) ("Finally, we note that officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne.").

The Court's review of the totality of the circumstances shown in the present record does not indicate that Defendant's will was in any way overborn. Nothing in the present record indicates that the environment in which the interview occurred was inherently coercive, nor that the interviewers engaged in any threatening or coercive tactics.

The June 9, 2020, interview was conducted in a squad room with ample space, Defendant was not handcuffed or otherwise restrained, Defendant sat closest to the door, and although the door was closed for privacy, it remained unlocked. Only two law enforcement officers, SA Wuori and Investigator Winkler, were present during the interview, and although they were armed, neither drew their weapon at any time during the interview. Defendant was also expressly informed that he could end the interview and leave at any time, and Defendant indicated he understood he

was there voluntarily. Further, the interview only lasted for approximately 55 minutes, thus it was not coercive in its duration. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (finding confession was voluntary despite a seven and one-half hour interrogation).

The recording and transcript of the June 9, 2020, interview demonstrate that at the outset of the interview, the interviewers expressly informed that he was not under arrest, his participation in the interview was voluntary, he could decide to stop the interview at any point, and he was free to walk out and leave at any time. The recording of the June 9, 2020, interview further demonstrates that the interview was conducted in a conversational tone, and the interviewers made no threats or promises to Defendant to induce his statements. See, Makes Room, 49 F.3d at 415 (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). SA Wuori testified that Defendant appeared to understand what was being discussed and asked of him, and he did not appear to be tired or under the influence of drugs or alcohol. The recording of the June 9, 2020, interview also shows that Defendant spoke willingly with the officers, understood what was being asked of him, and responded appropriately and coherently to the questions presented throughout.

The fact that the interviewers challenged Defendant's story of what happened at times during the June 9, 2020, interview also does not indicate Defendant's will was overborne. See, U.S. v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that "an 'expressed disbelief in the statements of a suspect'" does not "necessarily render a confession involuntary"). To the contrary, the fact that Defendant was able to insist that he was telling the interviewers the truth of what had happened, plainly indicates that Defendant's will was not overborne. As does the fact

that Defendant denied ever striking, hitting, or pushing the child. Moreover, Defendant was able to distinguish nuanced details, reject suggestions, and correct misstatements throughout the interview, which further indicates that his will was <u>not</u> overborne.[8]

Accordingly, under the totality of the circumstances, the Court concludes that Defendant's statements during the June 9, 2020, interview were voluntary.

Therefore, this Court recommends that Defendant's Motion to Suppress Statement, [Docket No. 37], be **DENIED**.

### III. Defendant's Motion to Suppress Search and Seizure. [Docket No. 38].

Defendant also moves the Court for an Order suppressing the evidence obtained during the June 9, 2020, interview conducted by law enforcement at the Mahnomen County Sheriff's Office. (Def.'s Mot. to Suppress Statement [Docket No. 37]). Specifically, Defendant argues that his consent to the search and seizure of his cellular phone and clothing during the June 9, 2020, interview was not voluntarily given. (<u>Id.</u>; Mem. in Supp. [Docket No. 49]).

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[S]earches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" <u>United States v. Muhammad</u>, 604 F.3d 1022, 1027 (8th Cir. 2010) (alteration in original) (quoting <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 372 (1993)). "Although a warrantless search presumptively violates the Fourth Amendment,

---

[8] For example, when SA Wuori recapped Defendant's description of what happened and stated that Defendant pulled the child by her legs after the mattress fell on her, Defendant replied, "I didn't pull her like, pull her like that, it's like pull her a little bit, so I could grab her by her arm and stuff." (Gov't's Ex. 4, at 8). After Defendant stated he put water on the child's hair and face following the incident, SA Wuori asked whether that was in the sink or tub, and Defendant responded, "Uh the shower." (<u>Id.</u> at 10). And when SA Wuori asked if Defendant walked outside, Defendant responded, "I run outside." (<u>Id.</u>).

voluntary consent to search is a well-recognized exception to the warrant requirement." United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). Importantly, however, consent must be voluntarily given.

An inquiry into the voluntariness of consent "turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual." United States v. Zamoran–Coronel, 231 F.3d 466, 469 (8th Cir. 2000); see also, United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011); United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000). In determining whether consent was voluntary, the relevant question is whether the individual had "a reasonable appreciation of the nature and significance of his actions" or whether his will had been overborne and his capacity for self-determination critically impaired. United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007); accord, United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011).

> Relevant factors regarding the individual allegedly providing consent include:
>
> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

Golinveaux, 611 F.3d at 959. The Court should also consider the environment in which the individual's consent was obtained including:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a seclude location; and (6) whether the individual stood by silently or objected to the search.

Id. These "factors are valuable as a guide to analysis," however, "these factors should not be applied mechanically." United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Moreover, in determining whether an individual has expressed consent, "[t]he precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) (citing United States v. Sanchez, 32 F.3d 1330, 1333–35 (8th Cir. 1994)).

The Government has the burden to show, by a preponderance of the evidence, that a defendant's consent was voluntary. See, United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

Here, Defendant acknowledges that he signed a consent form in reference to his cellular phone, but Defendant contends that his signature alone does not prove the voluntariness of his consent. (Mem. in Supp. [Docket No. 49], at 5). Defendant also observes that his signature was not obtained in reference to his clothing. (Id. at 3). In addition, Defendant asserts that the Government must demonstrate that in giving consent he did not merely acquiesce to a claim of lawful authority. (Id. at 5).

"The test applied to determine if consent is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." United States v. Escobar, 389 F.3d 781, 784–85 (8th Cir. 2004). "Thus, consent is involuntary when 'under all the circumstances it . . . appear[s] that the consent was . . . granted only in submission to a claim of lawful authority.'" United States v. Larson, 978 F.2d 1021, 1023 (8th Cir. 1992) (alterations in original) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). However, the test is not whether Defendant subjectively intended to consent, but whether objectively "his conduct would have caused a reasonable person to believe that he consented." Jones, 254 F.3d at

15

695; see also, Cedano-Medina, 366 F.3d at 684–85 ("In other words, a person can render a search legal by behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent.")."The 'ultimate question' is whether the individual's 'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent to search must have been involuntary." Vinton, 631 F.3d at 482 (quoting United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006)).

Based on the totality of the circumstances in the present case, this Court concludes that Defendant's consent was willingly and voluntarily given. Nothing in the present record objectively indicates that Defendant merely acquiesced to a claim of lawful authority when he gave consent for law enforcement to search and seize his phone and clothes. To the contrary, SA Wuori stated that he could not force Defendant to provide consent, it was Defendant's choice alone whether he wanted to give consent, and that Defendant could decline to give consent. (Gov't's Ex. 4, at 24). SA Wuori also provided his phone number to Defendant, confirmed Defendant would have access to a phone, and informed Defendant that he could revoke his consent at any time simply by calling SA Wuori. (Id.). Moreover, the Consent to Search form, which Defendant signed in reference to his phone, also expressly indicated in writing that Defendant could refuse consent, limit the scope of his consent, or if consent was granted, revoke that consent at any time. (Gov't's Ex. 5).

Regarding Defendant's relevant characteristics, these factors support the Court's conclusion that Defendant's consent to search and seize his cellular phone and clothes was voluntary. Defendant is an adult above the age of majority, and nothing in the record indicates that there were any signs that Defendant's intelligence was such that it rendered him incapable of providing consent. Defendant stated that he had head trauma a about two years prior to the June 9, 2020, interview, which affected his memory, but nothing in the present record indicates that

Defendant was so impaired as to render his consent involuntary. (See, e.g., Gov't's Ex. 4, at 22–23). Rather, as already noted, the recording and transcript of the June 9, 2020, interview clearly demonstrate that Defendant was able to understand and properly respond to the interviewers throughout the interview. Further, there is nothing in the record indicating that Defendant was in any way intoxicated or under the influence of drugs.

Defendant was not informed of his rights pursuant to Miranda; however, it is well-established that, while relevant, that factor does not, by itself, render consent involuntary. See, e.g., Golinveaux, 611 F.3d at 959; Saenz, 474 F.3d at 1137 ("We have not required an officer to provide Miranda warnings before requesting consent to search or held that an absence of Miranda warnings would make an otherwise voluntary consent involuntary."); United States v. Va Lerie, 424 F.3d 694, 710 (8th Cir. 2005) ("The Supreme 'Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.'") (quoting United States v. Drayton, 536 U.S. 194, 206 (2002)); United States v. Esquivias, 416 F.3d 696, 701 (8th Cir. 2005) ("While the officers did not inform [defendant] of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his voluntary consent to be voluntary.") (citing United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003)). Moreover, the Consent to Search form informed Defendant in writing not only that he had the right to refuse consent, but also "that any items seized or information obtained . . . may be used against me at any future hearing or trial." (Gov't's Ex. 5).

Regarding the environmental factors relevant to Defendant's consent, these factors also support the Court's conclusion that Defendant's consent to search a and seize his phone and clothes was voluntarily given. Defendant was not custody at the time he gave consent. Nor was he

handcuffed or otherwise restrained. The length of the June 9, 2020, interview was also not so long as to be inherently coercive. See, United States v. Rakotojoelinandrasana, 450 Fed. App'x 549, 551 (8th Cir. 2011) (finding consent was voluntary where the defendant had been detained for five hours in a private room at a casino and at a police station). Nothing in the present record indicates that SA Wuori, Investigator Winkler, or anyone else, used any threats, physical intimidation, or punishment to extract consent from Defendant. There is also no indication in the present record that SA Wuori, Investigator Winkler, or anyone else, made any promises or misrepresentations to Defendant in order to obtain Defendant's consent. Moreover, the fact that Defendant gave consent to search and seize his clothing but declined to give law enforcement his shoes demonstrates that his will was not overborne.

In sum, the record presently before the Court clearly indicates that Defendant provided express consent both verbally and in writing for law enforcement to search and seize his cell phone, and Defendant provided express verbal consent for law enforcement to search and seize his clothing.[9] Furthermore, the totality of circumstances in the present case indicates that Defendant's consent for law enforcement to search and seize his phone and clothing was voluntarily given, and as a result, all evidence obtained as a result thereof was lawfully seized without any violation of Defendant's Fourth Amendment rights.

Therefore, this Court recommends that Defendant's Motion to Suppress Search and Seizure, [Docket No. 38], be **DENIED**.

---

[9] Although Defendant did not sign a Consent to Search form in reference to his clothing, "[c]onsent can be given orally or in writing, and it is not necessary to use a written consent form." Saenz, 474 F.3d at 1136 (citing United States v. Siwek, 453 F.3d 1079, 1084 (8th Cir. 2006)). The present record clearly demonstrates that Defendant consented to the search and seizure of his clothing by stating, "you can take them if you want." (Gov't's Ex. 4, at 23). His verbal consent was sufficient, and it was not necessary for law enforcement to also obtain consent in writing. See, e.g., Saenz, 474 F.3d at 1136.

### IV. Conclusion

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Suppress Statement, [Docket No. 37], be **DENIED**, as discussed above; and

2. Defendant's Motion to Suppress Search and Seizure, [Docket No. 38], be **DENIED**, as discussed above.

Dated: August 13, 2021

s/Leo I. Brisbois
Leo I. Brisbois
U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.